# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

RODNEY CHAMBERS,

    PLAINTIFF,

VS.                                CASE NO.: CV-09-J-1011-NE

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    DEFENDANT.

## **MEMORANDUM OPINION**

This matter is before the court on the record and the briefs of the parties. This Court has jurisdiction pursuant to 42 U.S.C. § 405. The plaintiff is seeking reversal or remand of a final decision of the Commissioner. All administrative remedies have been exhausted.

## **Procedural Background**

The plaintiff applied for disability insurance benefits on September 21, 2006, due to diabetes, diabetic neuropathy, depression, back pain and arthritis alleging an inability to work since September 20, 1996 (R. 83, 99). The administrative law judge (ALJ) reached a determination that the plaintiff was not disabled at any time through the date of his decision, October 23, 2008 (R. 23). The plaintiff appealed this decision to the Appeals Council which denied his request for review on April 11, 2009 (R. 1-3). The ALJ's decision thus became the final order of the Commissioner.

*See* 42 U.S.C.§ 405(g).  This action for judicial review of the agency action followed (doc. 1).  The plaintiff argues that the ALJ's decision is not supported by substantial evidence.  Plaintiff's brief (doc. 9).

The court has considered the record and the briefs of the parties.  For the reasons set forth herein, this case is **REVERSED** and **REMANDED.**

## Factual Background

The plaintiff was born on November 25, 1967, and received a GED after leaving school in the eleventh grade (R. 40-41).  He testified that he was unable to continue working after he developed diabetic neuropathy, which caused his right foot to not work (R. 42).  At the time of the hearing, the plaintiff was receiving long term disability benefits through a policy he purchased from his past employer, Worthington Industries, where he worked for 18 years (R. 41, 47).  The plaintiff testified that he became unable to do the walking associated with his job because of the neuropathy (R. 42).  He estimated that currently, he could walk half a football field (R. 42).  During the day, he takes his youngest daughter to school, but does nothing else except read the paper and watch TV (R. 43). He estimated he could stand for 30 minutes and sit for 30 minutes to an hour at a time (R. 43).  The plaintiff testified his ability to sit was limited by his right leg and side, which would get numb and when he stands, it gives out and he falls (R. 43-44).  The ALJ inquired of the plaintiff how long he could sit if he could sit and stand when he wanted (R. 44).  The

plaintiff inquired if the ALJ meant without pain, to which the ALJ responded "No, sir. Just being able to do it" (R. 44).

The plaintiff further stated that the medication he took caused him to be drowsy, dizzy and fatigued (R. 45). The plaintiff testified he could grocery shop for about an hour, but could lift nothing heavier than ten pounds (R. 46). He drives about an hour a day as well (R. 46).

The plaintiff was first diagnosed with diabetes in 1999 (R. 48). He was on insulin pills, but had changed to a pump just prior to the hearing (R. 48). He began to develop neuropathy in January 2006 and within eight months was no longer able to perform his work (R. 48-49). The peripheral neuropathy causes numbness and tingling in his right leg (R. 49). He occasionally experiences this in his left leg as well, but it is not as painful as on the right side (R. 49). He gets burning sensations from his right hip down to his ankle and the bottom of his foot (R. 49).

Additionally, the plaintiff had a heart attack in February 2008 (R. 49). He has had ongoing chest pains since then (R. 49). If he exerts himself, the pain worsens (R. 50). Due to his medication, the plaintiff lies down for two and a half to three hours at a time, usually twice a day (R. 50). A few days before the hearing, the plaintiff was informed by his doctor that the back pain was actually caused by his kidneys, because there was blood in his urine (R. 51).

At the hearing, the Vocational Expert (VE) testified that the plaintiff's past relevant work was all at the medium to heavy level, and ranged between unskilled and skilled (R. 56). She testified that the plaintiff would have skills transferrable to the sedentary level (R. 56). The ALJ asked the VE to assume an individual with the same background as the plaintiff who could stand and walk for two hours in an eight hour work day and sit for six hours in an eight hour work day, who could operate hand and foot controls except for a limitation to occasionally on use of the right leg for such controls, who could occasionally climb ramps and stairs, stoop and kneel, who had limitations from ladders, ropes, scaffolds, crawling and crouching, hazardous machinery and unprotected heights (R. 58). The VE testified such a person could not return to the plaintiff's previous work, but would have skills which transferred to an industrial order clerk (R. 58). Additionally, an individual with the given limitations would be able to perform other sedentary, unskilled jobs such as an order clerk, which exist in significant numbers both in Alabama and nationally (R. 58-59).

At the hearing, plaintiff's counsel argued that the plaintiff meets Listing 9.08A (doc. 65). The plaintiff's medical records demonstrate ongoing medical problems from the time the plaintiff was first determined to suffer from diabetes (R. 150) until he was unable to continue to perform his past relevant work. He is treated for high blood pressure and depression, in addition to diabetes (R. 157-160, 164). In 2002 his medical records reflect complaints of lower back pain and right leg pain (R. 158),

which continued to the date of the hearing (R. 171). The plaintiff was first diagnosed with diabetic neuropathy in 2003 (R. 167). He was also noted to have carpal tunnel syndrome in his right hand (R. 170). He complained of pain and stiffness in his knee (R. 188).

Medical records dated in 2006 from Dr. Kirk Jackson, one of plaintiff's treating physicians, reflect the plaintiff's diagnoses of diabetes, diabetic neuropathy, and high blood pressure (R. 328, 332). The plaintiff was placed on light duty by his doctor on September 11, 2006, and again on September 20, 2006 (R. 329, 331). His doctor also noted that he had filled out forms for UnumProvident and would complete a handicap form when the plaintiff brought it in (R. 329). The plaintiff was noted to have paresthesia, lower back problems and arthralgia (R. 328, 332, 335, 336, 337, 388, 389). Muscle spasms in his lumbosacral spine were present (R. 331). His records reflect that he reported to his doctor he was "'unable to walk' – due to 'pain in feet & lower legs' Legs are 'weak'" and that his hands were numb (R. 329, 330, 332, 337). The diagnosis of lumbar radiculitus was added to diabetic neuropathy and diabetes (R. 329, 330). The records demonstrate right lower extremity weakness, that the plaintiff was limping, and that his lower extremity muscle strength was diminished (R. 389). A prescription for a "quad cane" was given (R. 389).

Dr. Jackson referred the plaintiff to Dr. Eston Norwood, a neurologist, due to ongoing numbness and tingling in his hands and feet, weakness in his feet and low

back pain (R. 353). He also had an unsteady gait which improved somewhat and trouble using his hands (R. 353). Previously performed nerve conduction studies showed evidence of neuropathy (R. 353). Upon examination, a slight left foot drop was noted, and Dr. Norwood opined that the plaintiff showed evidence of diffuse sensorimotor peripheral neuropathy, worse in his legs (R. 354). Upon follow up examination, an unsteady gait was noted (R. 352). Dr. Norwood stated "I believe he should continue off of work. I believe that it is not safe for him to return to work with his current impairment" (R. 352).

MRIs in October 2006 reflected minimal degenerative changes at C3-4,C4-5, and C5-6 levels, and a questionable hemangioma at T4 (R. 351, 363-365). Dr. Norwood commented that from a neurological standpoint "most interesting is cervical MRI evidence of mid thoracic cord signal raising question of myelomalacia[1]" (R. 351). He further found the plaintiff's gait to be stiff legged, spastic and ataxic (R. 351). Proprioception was very poor in the fingers; diminished pinprick appreciation was noted over the plaintiff's shins; and pseudoathetosis was noted in his fingers[2] (R. 351). Dr. Norwood concluded that his findings were more consistent with cervical

---

[1]Myelomalacia is a morbid softening of the spinal cord. *Dorland's Medical Dictionary for Health Consumers*. © 2007 by Saunders. It can cause paraplegia and paralysis.

[2]Pseudoathetosis is abnormal writhing movements, usually of the fingers, caused by a failure of joint position sense (proprioception) and indicates disruption of the proprioceptive pathway, from peripheral nerve to parietal cortex. Proprioception is the sense that indicates whether the body is moving with required effort, as well as where the various parts of the body are located in relation to each other.

myelopathy and opined that plaintiff's peripheral neuropathy could be unrelated (R. 351). Dr. Norwood recommended a brain MRI to look for evidence of plaques or other lesion (R. 351). He also stated the plaintiff was to be careful with his activities and to try a walker as tolerated (R. 351). The nerve conduction study referenced by Dr. Norwood concluded that the findings were indicative of diffuse sensory motor peripheral neuropathy, worse in the legs, and consistent with diabetic neuropathy (R. 356-357).

On a Physical Capacities Evaluation form dated January 15, 2007, Dr. Jackson opined that the plaintiff was limited to lifting 10 pounds occasionally to 5 pounds frequently, sitting 4 hours in an 8 hour work day, and standing and/or walking 2 hours in an 8 hour work day (R. 386). Dr. Jackson further noted that the plaintiff required an assistive device to ambulate, was limited to rarely performing push/pull movements with his arms and legs, rarely performing gross manipulation, fine manipulation and reaching, could occasionally operate a motor vehicle, and was completely limited from climbing, bending, stooping, and working around hazardous machinery (R. 386). Dr. Jackson also opined that the plaintiff likely would miss more than four days of work per month due to his medical problems (R. 386). Dr. Jackson further believed that the plaintiff suffers from pain to an extent that would be distracting to the adequate performance of work activities, that physical activity would greatly increase this pain to the extent medication would be necessary, and that

the side effects from the medication prescribed for neuropathy can be expected to be severe (R. 387).

On February 21, 2008, the plaintiff was admitted to a hospital for chest pain (R. 398). Those records reflect that the plaintiff "is disabled secondary to neuropathy." He was diagnosed with an acute inferior wall myocardial infarction (R. 399). His discharge diagnoses included atherosclerotic heart disease (R. 396).

## Standard of Review

In a Social Security case, the initial burden of establishing disability is on the claimant, who must prove that due to a mental or physical impairment he is unable to perform his previous work. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.1987). If the claimant is successful, the burden shifts to the Commissioner to prove that the claimant can perform some other type of work existing in the national economy. *Id.*

This court's review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir.1990). "Substantial evidence" is generally defined as "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v.*

*NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206 (1938)); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir.1996); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983).

This court also must be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir.1988); *Bridges v. Bowen,* 815 F.2d 622, 624 (11th Cir.1987); *Davis v. Shalala*, 985 F.2d 528 (11th Cir.1993). No presumption of correctness applies to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. *Brown v. Sullivan*, 921 F. 2d 1233, 1235 (11th Cir.1991); *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir.1991). Furthermore, the Commissioner's "failure to ... provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius*, 936 F.2d at 1145-1146.

When making a disability determination, the ALJ must consider the combined effects of all impairments. *Davis v. Shalala*, 985 F.2d at 533; *Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir.1990); *Walker*, 826 F.2d at 1001. When more than one impairment exists, the plaintiff may be found disabled even though none of the impairments considered alone would be disabling. *Id*. The ALJ must evaluate the combination of impairments with respect to the effect they have on the plaintiff's ability to perform the duties of work for which he or she is otherwise capable. *Lucas v. Sullivan*, 918 F.2d 1567, 1574 (11th Cir.1990). Merely reciting that the plaintiff's

impairments in combination are not disabling is not enough.  The ALJ is required to make specific and well articulated findings as to the effect of the combination of impairments.  *Walker*, 826 F.2d at 1001.

## Legal Analysis

In this case, the ALJ found that the plaintiff suffered from diabetes mellitus type 2 and diabetic neuropathy, which are severe impairments, but neither of which, singly or in combination, met or medically equaled the criteria of any of the listing of Impairments found in 20 CFR 404, Subpart P, Appendix 1 (R. 11, 14).  The ALJ considered the plaintiff's diagnoses of hypertension, atherosclerotic heart disease and cervical radiculopathy, but found each of them to be "non-severe" because they did not result in more than minimal limitations on the plaintiff's ability to function. As to the claims of radiculopathy, the ALJ discredited them, in part due to Dr. Norwood's finding of "intact proprioception in the fingers" (R.13).  While Dr. Norwood did note that in a September 2006 record, by October 2006 Dr. Norwood found that the plaintiff had good proprioception in his feet, but "very poor" proprioception in his fingers (R. 351).

The ALJ cannot pick and choose among a doctor's records to support his own conclusion.  The ALJ is not a medical doctor.  Based on this conclusion of Dr. Norwood, which supports Dr. Jackson's opinion that the plaintiff was limited in the use of his hands for fine and gross manipulation, the ALJ should have asked the VE

the effect the limitation on the use of his hands would have on the plaintiff's ability to perform substantial gainful employment.

Even if the court could find that the failure to consider limitations on the plaintiff's use of his hands to be harmless error, the ALJ further concluded that the plaintiff's allegations that he had neuropathy of the severity required by Listing 9.08A and 11.00C "are implausible" (R. 14). The ALJ then states that the "record shows the claimant has good unaided use of his extremities and musculoskeletal system" (R. 14). He continued that in 2008 the plaintiff "was observed to move all extremities well without use of any assistive devices" (R. 14) but the ALJ fails to cite any exhibit which actually support this finding. The ALJ then bolsters his finding with his own observations of the plaintiff's gait at his hearing (R. 14). He further relies on medical opinions of the plaintiff's treating physicians from 2006 (R. 20), even though more recent, and more restrictive, opinions from these very same treating physicians are contained in the record.

The plaintiff asserts that the ALJ failed to properly apply Listing 9.08A to the facts of this case constituted an error of law and thus, the ALJ's decision should be reversed. Listing 9.08 addresses diabetes. It requires diabetes with "Neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station." The defendant argues that the record reflects an absence of strength

and gait deficits. Defendant's response, at 7. However, the very pages cited by defendant in support of this argument actually reflect medical notations that the plaintiff suffers from paresthesia and arthralgia (R. 388-389, 432, 433, 434, 435), and diabetic neuropathy (R. 425, 434, 435, 436). Although Dr. Jackson did not continue to check paresthesia and arthralgia on every subsequent medical record, he did note that the plaintiff's physical condition was unchanged from his prior visits (R. 421, 422) and that the plaintiff suffered from diabetic neuropathy (R. 425, 427). In February 2007, Dr. Jackson noted in his record that the plaintiff still complained of pain in his right leg, back and flank and had decreased range of motion in his right hip (R. 436).

The defendant asserts that the record in 2008 shows that the plaintiff "was observed to move all extremities well without the use of any assistive devices and he had no focal neurological deficits." Defendant's response, at 7. The record actually reflects that, after suffering a heart attack and having a stent placed, that same day the plaintiff "[m]oves all extremities" and that "[t]here are no focal deficits noted" (R. 399). Of course, that same record notes that the plaintiff is "lying supine" (R. 399). Additionally, the same records that the defendant cites for the proposition that the plaintiff was observed for 2 days and was ambulating without difficulty (R. 396) also reflect that the plaintiff has a history of diabetes with "severe lower extremity

12

neuropathy" and that the plaintiff is "disabled secondary to neuropathy" (R. 398). The medical records simply do not state what the ALJ represents.

As to the plaintiff's daily activities, while the defendant asserts that the plaintiff "cares for his young children at home," defendant's response at 11, the record citation from defendant in support of this statement actually reflects that the plaintiff cannot use his hands, that his children prepare meals, that his children help with shopping, and that he drives only to pick up his daughter from school (R. 108-109). Additionally, the "young children" referred to by the ALJ (R. 18) were actually 19, 17, and 12 years of age at the time of the hearing. See e.g., R. 333 (stating childrens' ages as 17, 15 and 10 approximately 2 years prior to hearing date).

The ALJ also ignored the medical opinions, evidence and records of the plaintiff's treating physicians. Dr. Norwood clearly stated that he believed the plaintiff "should continue off work" (R. 352). Dr. Norwood did not find, as represented by the defendant, that the plaintiff should "have some work restrictions and that he should not return to his current job." Defendant's response, at 13. Rather, he stated that "it is not safe for him to return to work with his current impairment" (R. 352). Dr. Norwood also recommended a walker for the plaintiff, and stated that he would have to be careful with his activities (R. 351). As to Dr. Jackson's opinions, the ALJ simply concludes that Dr. Jackson is lying (R. 20).

While the court finds numerous other errors, misrepresentations, and twisting of facts to fit the ALJ's ultimate finding of no disability, the court is of the opinion that listing of each of these misstatements is not necessary, as the plaintiff clearly meets Listing 9.08.  He is a diabetic.  Multiple treating physicians have diagnosed him as suffering from diabetic neuropathy, as evidenced by nerve conduction studies, MRIs, and the ongoing documented problems the plaintiff experiences with his right leg and both hands.  The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.00C.  Here, two of plaintiff's physicians have opined that the plaintiff's impairments result in a need for him to be off work, and including limitations against using his hands for fine and gross movements more than rarely, and his legs for push/pull movements more than rarely (R. 386).  He was noted to suffer from paresthesia in his arms and legs and arthralgias in his hips and knee (R. 388).

The court notes Listing 9.08A, with its reference to Listing 11.00C, is really one of degree.  To meet this listing, a claimant must show a sufficient degree of interference with locomotion and/or interference with the use of his fingers, hands and arms.  Undoubtedly, the plaintiff has limitations on the use of his fingers and hands, as reflected in the opinion of Dr. Jackson (R. 386).  He has limitation with

locomotion, as evidenced by the repeated references to his gait and that he should obtain a walker or quad cane (R. 351, 388, 389, 398, 436).

The plaintiff testified that he quit working because "his right foot stopped"( R. 42). He testified he could walk 150 feet (half a football field) without getting tired (R. 42). During the day, the plaintiff stated he tries to clean his bedroom and tries to cook for his kids, he takes his youngest daughter to school and picks her up, he tries to walk, and does "pretty much nothing else" (R. 43). He stated his leg, specifically the neuropathy, keeps him from working, that sometimes he has trouble standing, and that he has trouble sitting (R. 43). His left leg gives him problems too, but it's not as painful as his right (R. 49). His medication makes him drowsy, dizzy and tired (R. 45). The ALJ's questions further established that the plaintiff estimated he could grocery shop maybe an hour, lift no more than ten pounds, drive an hour a day, dress himself, feed himself, and use a telephone (R. 46). However, the fact that the plaintiff can perform some limited tasks, like feeding himself and using a telephone, does not mean he is able to perform substantial gainful employment of eight hours a day, five days a week. In recognition of this, the Eleventh Circuit Court of Appeals has stated that "[n]or do we believe that participation in everyday activities of short duration, such as housework .... disqualifies a claimant for disability...." *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir.1997).

The ALJ's opinion based on his own observations of the plaintiff is even more problematic. According to the ALJ, the above activities establish that the plaintiff "has good unaided use of his extremities" (R. 14). The ALJ further noted that, at the hearing, the plaintiff was noted to have "normal gait without use of or testimony that he requires an assistive device" (R. 14). The ALJ opined that he "observed the claimant who (sic) no limitations with the use of his hands or upper extremities" (R. 13). The ALJ then noted

> The claimant's testimony of disabling right-sided pain, burning foot pain, and throbbing chest pain, worse with activity, despite use of medication is not consistent with his demeanor at the hearing even when he reportedly was unmedicated. While the hearing was short-lived and cannot be considered a conclusive indicator of the claimant's overall level of pain on a day-to-day basis, the apparent lack of discomfort during the hearing is given some slight weight in reaching the conclusion regarding the credibility of the claimant's allegations and the claimant's residual functional capacity.

(R. 18). Simply because the ALJ did not notice the plaintiff to be in discomfort, or unable to perform tasks with his hands or arms during a hearing that lasted less than one hour and did not require the plaintiff to perform any work oriented tasks, does not allow the ALJ to ignore the medical evidence and opinions of the plaintiff's treating physicians regarding the plaintiff's use of his hands or legs. "[A]s a hearing officer [the ALJ] may not arbitrarily substitute his own hunch or intuition for that of a medical professional." *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir.1992).

*See also Graham v. Bowen*, 786 F.2d 1113, 1115 (11th Cir.1986). Good cause to discredit a treating physician's opinion on disability or inability to work only exists where the doctor's opinion is not supported by the evidence, is inconsistent with the physician's own medical records, or merely is conclusory. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir.1997). None of these exceptions is relevant here. The treating physicians agree that the plaintiff suffers from diabetic neuropathy, that he has leg weakness for which a cane or walker was recommended, and that he is not capable of working. The ALJ cannot arbitrarily reject uncontroverted medical testimony. *Walden v. Schweiker*, 672 F.2d 835, 839 (11th Cir. 1982); *see also Flynn v. Heckler*, 768 F.2d 1273, 1275 (11th Cir. 1985).

The court also finds that the ALJ's justification for ignoring the medical records in favor of the report of the non-treating, non-examining and NON-physician opinion of a disability examiner, as well as his justification for ignoring the opinion of Dr. Jackson regarding the plaintiff's ability to engage in work related activity, to be erroneous, bordering on ludicrous. The rejection of treating physician medical opinions in favor of the residual functional medical capacity assessment completed by a "disability examiner" was error requiring reversal.[3] *Miller v. Barnhart,* 182

---

[3]The ALJ actually refers to two separate exhibits as supporting a finding of "not disabled" both of which the ALJ represents were completed by Dr. Hampton Smith, namely, Exhibits 5F and 7F. Exhibit 5F is a document completed by Dr. Smith, which very briefly summarizes plaintiff's medical conditions then states:

17

Fed.Appx. 959, 964, 2006 WL 1490162, 5 (11th Cir.2006) (holding that where ALJ relied on examining but non-treating physician and primarily used the evaluation by that doctor in posing hypothetical to the VE at the hearing, the ALJ committed error). *See also Lewis*, 125 F.3d at 1440.  The ALJ's suggestion that he could ignore Dr. Jackson's opinion because Dr. Jackson did not actually believe the plaintiff needed these limitations is both error requiring reversal and an insult to the medical profession.[4]  By inferring that the plaintiff was able to work from his selective review

---

> Please find out if the claiment (sic) has seen or has plans to consult with Dr. Oh. A medical deferral may be considered.  If there is no plan to see Dr. Oh. (sic) An RFC for a light range of work with standing and walking restricted to 3-4 hours may be appropriate along with the other neuroogiaal (sic) restrictions we use for a seizure disorder.

R. 370.  The court finds this is not even a medical opinion, but a request for further medical information to be obtained.

Exhibit 7F is a Residual Functional Capacity Assessment, completed by a Disability Exminer named Maria Johnson (R. 372-379).  Although Ms. Johnson notes "per consult with Dr H Smith (sic)" there is no evidence as to what she consulted him about, or how much of the exhibit was completed by her as opposed to Dr. Smith.  The defendant attempts to explain away Ms. Johnson's lack of medical degree by stating that the Commissioner may "conduct tests of his disability determination procedures" and that Alabama is such a test state.  Defendant's response, at 13.  While this may be so, it does not provide justification for accepting the opinion of a non-examining, non-treating, non-medical disability examiner over that of the plaintiff's treating physicians in regard to his physical limitations.

[4]The ALJ includes the following discussion of Dr. Jackson's medical opinion

> The doctor's opinion is without substantial support from the other evidence of record which renders it even less persuasive.  The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another.  Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians who might provide such a notice in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension.  While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from

of the evidence, the ALJ substituted his opinion for that of all of the medical reports in the file.

The court finds the record devoid of substantial evidence to support the decision of the ALJ. The ALJ could only reach this conclusion by ignoring or substituting his judgment for the medical evidence contained in the record. The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-1146 (11th Cir.1991). The ALJ did not consider all of the evidence that was introduced. His finding that the plaintiff's meeting of Listing 9.08 is "implausible" is against the substantial weight of the evidence. This court finds that the substantial weight of the evidence dictates a finding that the plaintiff has been under a disability since

---

the rest of the evidence of record, as in the current case.

R. 20. The court finds this is at best, rank speculation and at worst, libelous. An ALJ is not allowed to make medical findings or indulge in unfounded hunches about the claimant's medical condition or prospect for improvement. An ALJ may, of course, engage in whether idle speculations regarding the legitimacy of claims that came before him in his *private or personal capacity;* however, as a hearing officer *he may not arbitrarily substitute his own hunch or intuition for the diagnosis of a medical professional. Smith v. Astrue,* 641 F.Supp.2d 1229, 1233 (N.D.Ala.,2009); citing *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir.1992)(italics in original).

September 2006 and therefore the plaintiff is entitled to benefits in accordance with this determination.

## Conclusion

When evidence has been fully developed and unequivocally points to a specific finding, the reviewing court may enter the finding that the Commissioner should have made. *Reyes v. Heckler*, 601 F.Supp. 34, 37 (S.D.Fla.1984). Thus, this court has the authority under 42 U.S.C. §405(g) to reverse the Commissioner's decision without remand, where, as here, the Commissioner's determination is in plain disregard of the overwhelming weight of the evidence. *Davis v. Shalala*, 985 F.2d at 534; *Bowen v. Heckler*, 748 F.2d 629, 636 (11th Cir.1984). Based on the lack of substantial evidence in support of the ALJ's findings, it is hereby **ORDERED** that the decision of the Commissioner is **REVERSED.** This case is **REMANDED** to the Agency to calculate the plaintiff's monetary benefits in accordance with this Opinion.

**DONE** and **ORDERED** the 19th day of November, 2009.

_____
INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE